UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID RADEMAKER,<br><br>                              Plaintiff,<br><br>v.<br><br>D. PARAMO, et al.,<br><br>                              Defendants. | Case No.:  17-cv-02406-JLB-KSC<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**[ECF No. 43]** |

## I.    INTRODUCTION

Plaintiff David Rademaker, a state prisoner proceeding *pro se* and *in forma pauperis*, brought this action pursuant to the Civil Rights Act, 42 U.S.C. § 1983.  (ECF Nos. 1, 4.) Plaintiff's complaint alleges that various staff members at the Richard J. Donovan Correctional Facility violated his First Amendment right to free exercise of religion by failing to provide him with an adequate kosher diet.  (*See* ECF No. 1.)

Presently before the Court is Defendants' Motion for Summary Judgment.  (ECF No. 43.)  Plaintiff opposes Defendants' motion.  (ECF No. 62.)  The parties have consented to the disposition of this case by Magistrate Judge Jill L. Burkhardt pursuant to 28 U.S.C. § 636(c).  (ECF No. 27.)  The Court has determined that Defendants' Motion for Summary Judgment is suitable for disposition upon the papers and without oral argument.  CivLR

7.1(d)(1). Based on the motion papers and evidence filed in support thereof, the Court **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 43).

## II. BACKGROUND

### A. Procedural Background

On November 30, 2017, Plaintiff filed a complaint alleging First Amendment violations against the Richard J. Donovan Correctional Facility ("RJDCF") Warden, D. Paramo, and other RJDCF staff: Chief Deputy Warden G. Stratton, Associate Warden J. Juarez, Correctional Captain E. Garez, R. Olson, V. Sosa, B. Self, R. Segovia, and R. Decastro. (ECF No. 1 at 1–2.) Concurrently with his complaint, Plaintiff moved to proceed *in forma pauperis*. (ECF No. 2.)

On February 20, 2018, the Honorable Barry Ted Moskowitz granted Plaintiff's motion to proceed *in forma pauperis*. (ECF No. 4.) Pursuant to the screening procedure set forth in 28 U.S.C. § 1915(e)(2), Judge Moskowitz also dismissed Defendants Juarez, Garez, Olson, Sosa, and Self, leaving only Defendants Paramo, Stratton, Segovia, and Decastro. (*Id.* at 5.)

On May 29, 2018, the remaining four Defendants answered the complaint. (ECF No. 12.) The parties consented to Judge Burkhardt's jurisdiction on August 13, 2018. (ECF No. 27.)

Following a number of miscellaneous motions filed by Plaintiff, Defendants moved for summary judgment on November 26, 2018. (ECF No. 43.) The Court provided Plaintiff with notice of the requirements for opposing summary judgment pursuant to *Klingele/Rand* and set a Briefing Schedule on Defendants' motion. (ECF No. 44.)

On January 29, 2019, Plaintiff requested an extension of time to file an opposition to Defendants' motion. (ECF No. 48.) The Court granted Plaintiff's request and extended the deadline for Plaintiff to file a response from January 1, 2019, to February 27, 2019. (ECF No. 49 at 2.)

On March 12, 2019, Plaintiff's opposition was filed nunc pro tunc to March 1, 2019. (ECF No. 62.) Defendants filed a reply on March 14, 2019. (ECF No. 63.)

## B. Factual Background[1]

Plaintiff alleges the following in his complaint: Plaintiff is a kosher-observing Jewish prisoner currently incarcerated at RJDCF. (ECF No. 1 at 1, 3.) From September 2014 until November 2017, Defendants imposed a substantial burden on his exercise of Judaism by failing to provide him with "adequate and appropriate" kosher food. (*Id.* at 3.) Specifically, for over two years, Plaintiff: (1) did not receive a kosher diet; (2) did not receive kosher meals within twenty-four hours; (3) did not receive hot kosher meals; or (4) received "spoiled" and "not consumable" kosher meals. (*Id.*)

Defendant Paramo is the Warden at RJDCF. (*Id.*) Defendant Paramo had knowledge of Plaintiff's complaints through written correspondence from Plaintiff to Defendant Paramo in April 2015, on September 9, 2015, on March 1, 2016, and on March 9, 2016, but failed to take corrective action. (*Id.* at 3–4.)

Defendant Stratton is the Chief Deputy Warden at RJDCF. (*Id.* at 4.) Defendant Stratton was made aware of the burdens imposed on Plaintiff's practice of Judaism on May 26, 2015, but failed to take corrective action. (*Id.*)

Defendant Decastro is the Supervising Correctional Cook at RJDCF "who was directly responsible for ensuring the Kosher Diet Program was implemented." (*Id.* at 5.) Defendant Decastro was made aware of the burdens imposed on Plaintiff's practice of

---

[1] The Court summarizes the allegations in Plaintiff's complaint for background purposes only. Because Plaintiff did not sign his complaint under penalty of perjury, the Court does not consider the allegations in it as evidence in ruling on the instant Motion for Summary Judgment. *Moran v. Selig*, 447 F.3d 748, 759 & n.16 (9th Cir. 2006) (stating that unverified complaints "cannot be considered as evidence at the summary judgment stage"); *see also Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018) (noting that *pro se* inmates are exempted from "*strict* compliance with summary judgment rules" but not "*all* compliance"); *Harris v. Shelland*, No.: 15cv2442-MMA-JLB, 2017 WL 2505287, at *4 (S.D. Cal. June 9, 2017) (rejecting a *pro se* plaintiff's unverified complaint as evidence in ruling on a motion for summary judgment).

Judaism through Plaintiff's October 15, 2015 inmate appeal but failed to take corrective action.[2] (*Id.*)

## III. STATEMENT OF UNDISPUTED FACTS[3]

### A. Distribution and Contents of Plaintiff's Kosher Meals

Plaintiff was approved to participate in the Salinas Valley State Prison's Kosher Meal Program in 2011 or 2012 and has been in a kosher meal program ever since. (ECF No. 43-5 at 3:21–4:3.) For over two years, inmates in the Kosher Diet Program at RJDCF received three meals at the same time—dinner for that night, and breakfast and lunch for the next day. (*Id.* at 27:10–15.) Plaintiff received his three kosher meals at some time between 12:15 PM and 6:30 PM daily. (*Id.* at 35:14–21.) Because the timing of the kosher meal distribution varied, Plaintiff sometimes received his three meals for one day more than twenty-four hours after he received his three meals for the previous day. (*Id.*)

The main portion of Plaintiff's kosher meals were distributed in sealed food trays from outside vendors. (*Id.* at 13:24–14:5; 19:19–24; 21:14–18; 39:10–12.) For breakfast, the sealed kosher tray contained individual, sealed containers of a bread item (such as a bagel), a fruit cup, and peanut butter and jelly or cream cheese. (*Id.* at 6:10–12; 7:14–19; 13:24–14:21; 37:11–15.) The fruit cup was like those that would be sold on the shelf (i.e., unrefrigerated) in a grocery store. (*Id.* at 8:13–24.) Plaintiff also received either oatmeal or grits for breakfast once or twice a week, which he was able to cook in a hot pot. (*Id.* at 6:10–7:13.) In addition to the kosher breakfast tray provided from outside vendors, Plaintiff received one cold milk and one fruit or vegetable (such as an apple, banana, bell

---

[2]     Plaintiff names R. Segovia as a defendant in the caption of the complaint but does not otherwise allege that Defendant Segovia committed any constitutional violations. Defendant Segovia was not dismissed in Judge Moskowitz's screening order. (*See* ECF No. 4 at 5–6.)

[3]     The Court derives these facts from Plaintiff's deposition testimony (ECF No. 43-5) and Plaintiff's opposition, sworn under penalty of perjury (ECF No. 62). These facts are undisputed by Defendants.

4

pepper, or onion) from the RJDCF kitchen at 6:30 AM every day.  (*Id.* at 7:20–8:11; 20:6–21:14.)  These food items, although provided directly from RJDCF and not part of the pre-packaged kosher meal trays, were "part of the kosher program" and were not "extra."  (*Id.* at 21:6–9; 37:16–25.)

For lunch, the sealed kosher tray contained individual, sealed containers of a protein, such as tuna, a turkey roll, beef baloney, or peanut butter and jelly.  (*Id.* at 6:13–15; 14:24–15:4; 15:21–16:3.)  The tuna was packaged "standard off the shelf" in a resealable plastic bag and was not required to be refrigerated.  (*Id.* at 5:2–23.)  Plaintiff received tuna in his lunch tray once a week.  (*Id.* at 14:22–25.)  The non-tuna lunch meats were packaged "similarly to the tuna," except they were sealed in a clear plastic package.  (*Id.* at 15:5–11.)  The non-tuna lunch meats were packaged as they would be sold on a store shelf, if they had a "use by manufacture date."  (ECF No. 62 at 5.)  Plaintiff received non-tuna lunch meat in his lunch tray "two or three time a week."  (ECF No. 43-5 at 14:22–15:4.)

Plaintiff also received sealed packages of crackers, pretzels, sunflower seeds, or rice crackers with his lunch tray, and he sometimes received apple sauce and/or a cookie.  (*Id.* at 5:1, 24–25; 16:4–14.)  These foods were packaged as they would be sold "on a shelf at a grocery store" and looked "similar to the type that everyone gets in the general population."  (*Id.* at 16:6–18.)

For dinner, the sealed kosher tray contained a main dish and two side dishes.  (*Id.* at 18:2–3; 37:7–10.)  The main dish consisted of meatballs, spaghetti, lasagna, or a fish patty. (*Id.* at 17:18–24.)  The side dishes consisted of a vegetable, such as carrots or peas, and a starch, such as rice.  (*Id.* at 18:1–4.)  In addition to the sealed food tray provided from outside vendors, Plaintiff received a salad, three pieces of bread, butter, and a muffin from the RJDCF kitchen.  (*Id.* at 21:21–23.)

After Plaintiff received his three meals, he would sometimes eat all three meals together at one time.  (*Id.* at 38:8–9.)  Plaintiff felt that he should not have to choose to eat all the perishable foods at dinner and save the non-perishable foods for his breakfast and lunch the following day.  (*E.g.*, *id.* at 28:2–11.)  Plaintiff wanted his breakfast and lunch

meals to be served at breakfast time and not dinner time.  (*Id.* at 28:2–11; 33:3–17; 39:17–40:3.)

Plaintiff was never forced to eat his three meals all at once.  (*Id.* at 38:22–24.) Plaintiff did at times save the non-perishable foods from the food trays in his cell to eat for breakfast or lunch.  (*Id.* at 26:23–27:9.)  For example, if Plaintiff had crackers or a bagel in his breakfast or lunch tray, he could save them to eat by noon the next day.[4]  (*Id.* at 39:1–3.)  However, even though the "meat packs" were sealed, Plaintiff could not eat them after "more than four hours" had passed because they were unrefrigerated.  (*Id.* at 28:12–18.) There were stickers on Plaintiff's "food bags" with the words "must consume in four hours" or "must be consumed within 4 hours."  (*Id.* at 28:12–18; ECF No. at 62 at 41.)

RJDCF correctional officers conducted daily cell searches after lunchtime to search for leftover food for health and safety reasons.  (ECF No. 43-5 at 16:20–17:17.)  Food that was not eaten by the afternoon cell search was thrown away by the correctional officers. (*Id.* at 16:20–17:17; 26:9–15.)

RJDCF no longer routinely provides Plaintiff with all three of his kosher meal trays at one time.  (*See id.* at 33:18–34:9.)  Plaintiff received all three meal trays at dinner time only once or twice in September 2018, once in August 2018, once or twice in July 2018, and maybe once in June 2018.  (*Id.*)  RJDCF staff has "been very good" about changing the kosher food distribution system so Plaintiff receives his breakfast and lunch meals in the morning.  (*Id.* at 34:10–12.)  For example, on September 16, 2018, Plaintiff received his breakfast and lunch at 6:30 AM and his dinner around 5:35 PM.  (*Id.* at 24:19–23.)

**B.    Frozen Sabbath Meals**

Because the Sabbath is a day of rest in Judaism, and traditionally there is no cooking done on the Sabbath, the Saturday kosher dinner trays at RJDCF are cold meals.  (*Id.* at

---

[4]    The Court notes that Plaintiff has also taken the contradictory position that he had to consume all his food within four hours of receipt when he testified that if he waited to eat his food, "it spoil[ed]," and "[s]poiled food is not kosher."  (ECF No. 43-5 at 38:22–25.)

6

17:18–21; 18:10–13; 29:19–22.)  Every week or every other week, Plaintiff received his Saturday dinner tray while it was still frozen.  (*Id.* at 18:15–19:9.)  For example, if Plaintiff received his dinner tray at 6:00 PM and it was frozen, he may have had to wait until around 8:00 PM for his meal to thaw.  (*Id.* at 19:4–13; 29:19–31:6.)  Plaintiff was able to bring his dinner tray to his cell to wait for it to defrost.  (*Id.* at 19:10–12.)  Plaintiff did not want to have to wait the two to four hours it would take for his meal to defrost before eating it.  (*Id.* at 31:2–6; 32:3–5.)

**C.    Spoiled Food**

Sometimes the fruit or vegetable (such as an apple, banana, bell pepper, or onion) that Plaintiff received in the morning or the salad Plaintiff received with dinner were served to him spoiled.  (*Id.* at 7:20–8:11; 9:2–10:1; 19:23–24; 20:6–21:14.)  The vegetables in his kosher dinner tray "never came spoiled."  (*Id.* at 19:19–24.)  Plaintiff believes that spoiled or rotten food is not kosher.  (*Id.* at 36:21–25; 38:25.)

Plaintiff received spoiled produce from the RJDCF kitchen at irregular intervals: sometimes every day, sometimes once a week, or sometimes every two weeks.  (*Id.* at 12:12–13; 13:14–23.)  Two weeks could go by where the salad and vegetables were "fresh" and "everything [was] perfect."  (*Id.* at 13:14–20.)  Plaintiff refused to eat spoiled food or food with "fungus" on it.  (*Id.* at 9:2–8.)  If Plaintiff received a spoiled vegetable, then he would sometimes receive a replacement vegetable.  (*Id.* at 11:2–4.)  Plaintiff received a replacement vegetable "about 50 percent of the time."  (*Id.* at 12:9–11.)  If kitchen staff did not want to "bother" replacing the spoiled vegetable, then they would tell Plaintiff to "write it up."  (*Id.* at 11:2–7.)

Plaintiff was still receiving spoiled fruits or vegetables from the RJDCF kitchen around the time of his deposition on September 26, 2018.  (*Id.* at 2; 9:19–20; 13:21–22.)  However, the salad around that time had "lately . . . been fresh."  (*Id.* at 21:14–18.)

///

///

///

## IV.    LEGAL STANDARDS

### A.    Summary Judgment

Federal Rule of Civil Procedure 56 empowers a court to enter summary judgment on factually unsupported claims or defenses to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is appropriate if the materials in the record, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc).

Each party's position as to whether a fact is disputed or undisputed must be supported by: (1) citation to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) a showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1). The court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3). If a party supports its motion by declaration, the declaration must set out facts that would be admissible in evidence and show that the affiant or declarant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). An affidavit will not suffice to create a genuine issue of material fact if it is "conclusory, self-serving . . . [and] lacking detailed facts and any supporting evidence." *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).

When a defendant seeking summary judgment has carried its burden under Rule 56(c), the burden shifts to the plaintiff who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). The plaintiff "must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita*, 475 U.S. at 587 (internal citation omitted). If the

plaintiff fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 325.

**B.    First Amendment Free Exercise Clause**

The free exercise clause of the First Amendment "requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people." *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). "Inmates clearly retain protections afforded by the First Amendment including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (citation omitted) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).

"To merit protection under the free exercise clause of the First Amendment, a religious claim must satisfy two criteria." *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994). First, an inmate must show that his religious belief is "sincerely held." *Id.* (quoting *Callahan v. Woods*, 658 F.2d 679, 683 (9th Cir. 1981)). Second, the inmate must demonstrate that his claim is "rooted in religious belief, not in 'purely secular' philosophical concerns." *Id.* (quoting *Callahan*, 658 F.2d at 683). To be deeply rooted in religious belief, an inmate's claim need not be compelled by or central to his religion. *See Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 708 (1981) ("The guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect."); *Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008) (noting that the "sincerity test" and not the "centrality test" applies to a free exercise analysis). Instead, "[d]etermining whether a claim is 'rooted in religious belief' requires analyzing whether the [inmate]'s claim is related to his sincerely held religious belief." *Malik*, 16 F.3d at 333.

Once the inmate makes this initial showing, he must then establish that a prison official's actions "substantially burdens [the] practice of [his] religion." *Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015). "A substantial burden . . . place[s] more than an inconvenience on religious exercise; it must have a tendency to coerce individuals into acting contrary to their religious beliefs or exert substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Ohno v. Yasuma*, 723 F.3d 984, 1011 (9th

Cir. 2013) (quoting *Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*, 456 F.3d 978, 988 (9th Cir. 2006)). In other words, the burden must prevent the inmate "from engaging in [religious] conduct or having a religious experience." *Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1033 (9th Cir. 2006), *overruled on other grounds by* 535 F.3d 1058 (9th Cir. 2008) (en banc).

Under the free exercise clause, inmates "have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their religion." *Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993) (quoting *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987)). The free exercise right, however, is necessarily limited by the fact of incarceration and may be curtailed to achieve legitimate correctional goals or to maintain prison security. *O'Lone*, 482 U.S. at 348–49. Even when a prison policy or practice substantially burdens an inmate's religious exercise, it will not violate the First Amendment if the government can demonstrate that the policy or practice "is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 79, 89 (1987).

## V. **DISCUSSION**

### A. **Three-Meal Distribution of Kosher Meals**

In his complaint, Plaintiff alleges that there were times when he was not served a kosher meal within twenty-four hours. (ECF No. 1 at 3.) However, as clarified by Plaintiff in his deposition, Plaintiff actually received three kosher meals for the day, provided at one time, every day of the week. (ECF No. 43-5 at 35:22–25.) Because the timing of the kosher meal distribution varied, Plaintiff sometimes received his three meals for one day more than twenty-four hours after receiving his three meals for the previous day. (*Id.* at 35:14–21.) Plaintiff's real complaint therefore seems to be that receiving his breakfast, lunch, and dinner meals all at one time imposed a substantial burden on his practice of Judaism. (*See* ECF No. 62 at 10–11.)

///
///
///

1.   <u>Sincere Belief, Rooted in Religion</u>

For Plaintiff's claim to merit protection under the First Amendment, he must first show that his religious belief is sincerely held and that his claim is rooted in religion. *Malik*, 16 F.3d at 333. In their motion, Defendants do not address, and therefore do not dispute, that Plaintiff's practice of eating a kosher diet is based on a sincerely held belief, rooted in religion. Plaintiff in his opposition states that he "is very serious about his Jewish faith" and that he believes the consumption of "kosher food is to prepare [his] soul for the afterlife." (ECF No. 62 at 8.) Nothing in the record before the Court challenges Plaintiff's sincerity, and there is no dispute that claims for an adequate kosher diet are rooted in religious belief. *See Sprouse v. Ryan*, 346 F. Supp. 3d 1346, 1356 (D. Ariz. 2017). To establish a free exercise violation, Plaintiff must then show that the three-meal distribution system substantially burdened his practice of Judaism.

2.   <u>Substantial Burden</u>

a.   *Consumption of Perishable Food*

In their motion, Defendants argue that Plaintiff undisputedly received three meals every day in the afternoon or late afternoon, and each meal was kosher. (ECF No. 43-1 at 15.) Defendants contend that although Plaintiff's meal trays may have contained perishable foods, Plaintiff's meal trays also contained non-perishable foods that Plaintiff "could have saved to eat for breakfast or lunch." (*Id.*) Defendants point out that Plaintiff's meal trays "contained non-perishable items such as packaged tuna, bread, crackers, sunflower seeds, fruit, vegetables, a muffin, and peanut butter, that could be saved to be eaten later." (*Id.*) Defendants argue that Plaintiff's displeasure in "having to eat perishable foods at dinner and save non-perishable foods for the next day did not substantially burden [his] religious practices since he had kosher food available to eat at every meal." (*Id.*)

In his opposition, Plaintiff seems to argue that the three-meal distribution system made him "choose either [to] violate his religious law fund[a]mentals" or "eat spoiled food." (ECF No. 62 at 11.) Plaintiff does not dispute that he was never forced to eat all his meals at one time but does contend that he had to consume all his "food bags" in "four

hours" because of "bacterial growth."[5]  (*Id.*)  Plaintiff states that "clearly printed on all department of correction and reh[a]bilitation food bag[s] [was] 'must consume in four hours' because of food born bacteria." (*Id.* at 9.)  The Court understands Plaintiff's argument to be that he had to choose between eating spoiled food, in violation of his religious beliefs, or he had to eat all his perishable food within four hours of receiving it.[6]

The Court first addresses Defendants' argument that having to eat perishable foods at dinner and save non-perishable foods for the next day did not substantially burden Plaintiff's religious practices because he had kosher food to eat at every meal.  (ECF No. 43-1 at 15.)  Defendants argue that Plaintiff was able to save his non-perishable food items, specifically identifying tuna, to eat for lunch the next day.  (*Id.*)  However, Plaintiff was provided with tuna in his lunch tray once a week only.  (ECF No. 43-5 at 14:22–25.)  Two or three times a week, Plaintiff was provided with "a pack of sealed meat," and whether Plaintiff was able to wait until lunchtime to consume the non-tuna lunch meat is unclear in

_____

[5]  Plaintiff also contends in his opposition that he "could never save his . . . cracker, bagel, or any food products in his non-aircondition[ed] cell because of daily cell searches." (ECF No. 62 at 10.)  But, as admitted by Plaintiff in his deposition testimony, correctional officers only confiscated food in cell searches that occurred after lunchtime.  (ECF No. 43-5 at 17:14–17.)

[6]  Plaintiff also argues that the three-meal distribution system violated RJDCF policy. (ECF No. 62 at 9.)  Plaintiff cites to Chapter 5, Article 51, § 54080.5 of the RJDCF Operations Manuel (revised January 2018), which provides in pertinent part that: "Breakfast shall begin at approximately 0615 hours and dinner shall begin at approximately 1715 hours.  Breakfast shall be served no more than fourteen (14) hours following the previous day's dinner meal. . . . Lunches shall be passed out during breakfast." (*Id.* at 31.) However, § 1983 provides a cause of action only for violations of the U.S. Constitution and federal laws, and "a violation of a prison regulation or policy is not a *per se* constitutional violation." *Brown v. Galvin*, No. 2:16–cv–2629 JAM DB P, 2017 WL 6611501, at *3 (E.D. Cal. Dec. 27, 2017).   Additionally, in an appeal decision dated October 15, 2015, Defendant Decastro stated that "[t]he kosher meal consists of the evening dinner for Thursday, March 19, 2015, along with the breakfast and lunch meal for Friday, March 20, 2015, which is outlined in the DOM Supplement . . . ." (ECF No. 62 at 16.)  Thus, it appears as though the three-meal distribution of the Kosher Diet Program's meals was not a violation of RJDCF policy.

the record before the Court. Plaintiff testified that the tuna was packaged in a way that it did not have to be refrigerated. (*Id.* at 5:21–23.) Plaintiff further testified that the non-tuna lunch meat was packaged "similarly to the tuna," but he did not explicitly state that the non-tuna lunch meat did not require refrigeration. (*See id.* at 14:24–15:20.) Plaintiff provides in his opposition that if the lunch meat had a "use by manufacturer date . . . [it] would be store usable." (ECF No. 62 at 5.) Yet, Plaintiff also testified that he would have to eat the "sealed meat packs" in "four hours" because they were "unrefrigerated." (ECF No. 43-5 at 28:12–18.)

Nonetheless, the Court finds that whether Plaintiff was able save his lunch meat to consume at lunchtime two to three times a week is not a material fact that precludes the Court from finding that Plaintiff's practice of religion was not substantially burdened by the three-meal distribution system. Even assuming that, three times a week, Plaintiff did not have lunch meat to eat with his other lunch foods—because he would have to eat the lunch meat at dinner time—a reasonable jury could not find that this was anything more than an inconvenience to Plaintiff, which does not give rise to a First Amendment violation. *See Ohno*, 723 F.3d at 1011. Plaintiff testified that he wanted his kosher meals to be served differently because "[i]f [he] want[ed] to eat breakfast, [he] want[ed] to eat breakfast like everyone, normal, in the whole State of California that gets breakfast at one time," not because he felt substantially pressured by the three-meal distribution system to modify his behavior and abandon his kosher diet. (ECF No. 43-5 at 39:20–23.) Under the First Amendment, Plaintiff has "the right to be provided with food sufficient to sustain [him] in good health that satisfies the dietary laws of [his] religion." *McElyea*, 833 F.2d at 198. There is no dispute that Plaintiff received three kosher meals a day. Moreover, Plaintiff does not allege that having to eat his perishable lunch meat with his dinner had any adverse consequences on his health.[7]

---

[7] The only mention Plaintiff makes of his health in connection with his diet and the three-meal distribution system is that he must take his "psychotropical" medication with

The Court turns next to Plaintiff's argument that although he was never forced to eat his three meals all at once, the words "must consume in four hours" were "printed on <u>all</u>" of his "food bags." (ECF No. 62 at 6, 9.) Defendants wholly ignore this argument in their reply.

The Court finds that Plaintiff's statements in his opposition are overly conclusory and too vague to create a genuine dispute of material fact as to whether Plaintiff had to consume all parts of all his kosher meals within four hours of receiving them. *See, e.g.*, *Saddiq v. Trinity Servs. Grp.*, 198 F. Supp. 3d 1051, 1069 (D. Ariz. 2016) (finding generalized statements in inmate affidavits that the prison had "served rotten vegetables, undercooked beans and frozen portions on its kosher/halal diet trays" lacking in factual detail and therefore insufficient "to create a genuine issue of material fact that [the prison] violated specific Islamic religious tenets in its meal preparation"). Plaintiff never states exactly what food items the words "must consume in four hours" were printed on, except for unspecified "meat packs" and "food bags." (ECF No. 43-5 at 28:12–18.)

The facts in *Nance v. Miser* are sufficiently analogous to those here, and the district court's reasoning is persuasive. No. CV 13-0313-PHX-SMM (DKD), 2014 WL 11332298 (D. Ariz. Sept. 22, 2014). In *Nance*, the inmate plaintiff was a practicing Muslim and observed the month of Ramadan, which required him to fast from sunrise to sunset. *Id.* at *1. The plaintiff alleged that the timing of the prison's breakfast meal service forced him to choose between eating his breakfast prior to sunrise or engaging in group prayer. *Id.* However, each evening during Ramadan, the defendants offered the plaintiff "a sack meal

---

food or it will make him "very sick." (ECF No. 62 at 10.) Plaintiff testified that if he ate all his meals "at one time," then he would have "nothing to eat during the day," so he would "get sick from [his] medication." (ECF No. 43-5 at 38:8–15.) However, Plaintiff also testified that he was not forced to eat all his meals at once and could save non-perishable foods to eat for breakfast and lunch (*id.* at 26:21–27:12), which means he had alternatives to taking his medication on an empty stomach. Plaintiff is currently "no longer on psychotropic medication." (*Id.* at 38:16–18.)

to keep in his cell so he could eat breakfast at a time of his choosing" before sunrise, to accommodate his fast. *Id.* at *4. The plaintiff refused to eat the sack meal because, based on his "personal knowledge and experiences," he feared the food would spoil if he waited until the morning to eat it. *Id.* As support, the plaintiff cited to a letter he received from the Arizona Department of Health Services, which stated that "potentially hazardous foods" must be held at certain temperatures and "must be consumed within 4 hours of leaving the preparation facility." *Id.*

The district court, in granting the defendants' motion for summary judgment, explained that:

> [t]o defeat summary judgment, Plaintiff must present evidence sufficient for a reasonable jury to return a verdict in his favor. Plaintiff has not done so because he has failed to adduce any evidence—apart from his conclusory allegations—that the sack meal could not have been kept for consumption before [sunrise]. Because Plaintiff had the option to eat his sack meal prior to [sunrise] and participate in group prayer[,] . . . the Court finds there is no burden to Plaintiff's religious exercise. While Plaintiff may have preferred a different method of accommodation, that does not automatically create a substantial burden or render Defendants' actions unconstitutional.

*Id.* (citation omitted) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Here, as evidence, Plaintiff cites only to inmate grievances wherein he asked about the purpose of the consumption warnings on his "food bags," but neither his questions nor the responses to these grievances shed any light on what food items these labels were placed on or applied to, or how often Plaintiff received a "food bag" with a four-hour consumption time limit.[8] (ECF No. 62 at 95, 222). As in *Nance*, Plaintiff has not offered

_____

[8] In response to one grievance, RJDCF staff wrote that "food in your meal bag should [and] must be consumed in four hours for safety reasons, because bacterial growth starts if it stays out uneaten more than [four] hours. This note prevents anyone from any illness like food poisoning . . . [and] other stomach upsets." (ECF No. 62 at 95.) In response to another grievance, RJDCF staff wrote that the label on the "food bag" was there to

any evidence that he was not provided with non-perishable foods that he could safely keep in his cell to consume at either breakfast or lunchtime.

Perhaps more importantly, Plaintiff's contention in his opposition that all food bags bore the words "must consume in four hours," and therefore he had to eat all his food within four hours of receiving it, is inconsistent with his deposition testimony. Plaintiff testified that he could save non-perishable foods, such as crackers, a bagel, and "shelf safe" tuna, to eat the next day, and "[t]hat's what [he] has always been doing." (ECF No. 43-5 at 27:6–9.) Additionally, Plaintiff testified that "all the packages that the food came in" were "sealed," and that "there was nothing that stopped [him] from eating those packages within four hours of opening—of breaking the seal." (*Id.* at 39:10–17.) Plaintiff's self-serving declaration is insufficient to raise a triable issue of fact in light of his deposition testimony to the contrary. *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.").

Although Plaintiff certainly may have found the distribution of his kosher meals in conflict with his personal preferences, the inconvenience to Plaintiff did not amount to a substantial burden on his ability to maintain a kosher diet. Accordingly, Defendants are entitled to summary judgment on this claim.

### b. *Consumption of Meat and Dairy Together*

In his opposition, Plaintiff also argues that because he was "fed breakfast, lunch, and dinner meals once a day," he was "prevented . . . from practicing his religious beliefs." (ECF No. 62 at 9.) Plaintiff then states that his Jewish faith prohibits the consumption of dairy and meat together and that "you have to wait a minim[um] of (1) one hour," presumably to consume either food product after consuming the other. (*Id.* at 9, 11.) Defendants do not address this argument in their reply.

─────────────────────

"identif[y] and indicate the time that is [four] hours past the point in time when the food is removed from temperature control." (*Id.* at 222.)

As previously stated, Plaintiff testified that he was never forced to eat his three kosher meals all at once. (*Id.* at 38:22–24.) Additionally, there is no evidence before the Court that Plaintiff ever consumed dairy within one hour of consuming meat, or vice versa. Even if he had, it would have been due to his own volition. The only dairy products Plaintiff testified to receiving in his kosher meal trays were a sealed package of cream cheese in his breakfast meal tray, delivered at dinner time, and one cold milk supplied by the RJDCF kitchen at 6:30 AM. (*Id.* at 6:10–12; 8:6–9.) When asked if he "could choose when to break the seal on [the] cream cheese," Plaintiff testified that he could. (*Id.* at 40:4–8.) As such, Plaintiff has not set forth any evidence that the three-meal distribution system substantially burdened his practice of Judaism in this regard.

**B.     Frozen Dinner Trays on the Sabbath**

In his complaint, Plaintiff alleges that there were times when his koshers meals were not served hot. (ECF No. 1 at 3.) Plaintiff explained at his deposition that he observes the Sabbath, a "day of rest" in the Jewish faith, on Saturdays. (ECF No. 43-5 at 18:13.) Because the Sabbath is a day of rest, observants of the Sabbath do not cook. (*Id.* at 29:21–22.) In keeping with this tradition, the kosher meals at RJDCF are served cold on Saturdays. (*Id.* at 29:20–22.) Plaintiff testified that he would sometimes receive a frozen kosher dinner tray on Saturdays, so he would have to wait two to four hours for his meal to defrost before he could eat it. (*Id.* at 18:15–19:13; 29:19–31:6.) Thus, Plaintiff seems to maintain that his religious practice was substantially burdened because he sometimes had to wait for the dinner tray he received on Saturdays to defrost before eating it.

1.     <u>Sincere Belief, Rooted in Religion</u>

In their motion, Defendants do not address, and therefore do not dispute, that Plaintiff has a sincerely held belief, rooted in religion with respect to his desire to keep kosher and observe the Sabbath as a day of rest. Again, Plaintiff asserts in his opposition that he is "very serious about his Jewish faith," and he testified that he observes the Sabbath, a day of rest, on Saturdays. (ECF Nos. 62 at 8; 43-5 at 18:13–14.) The Court finds that Plaintiff's practice of keeping kosher and observing the Sabbath is one that is

sincerely held and rooted in religion. Thus, the Court turns to whether Plaintiff has demonstrated that having to wait two to four hours to for his dinner tray to defrost on the Sabbath imposed a substantial burden on his observance of the Sabbath and his ability to keep kosher.

### 2. Substantial Burden

The undisputed facts show that because the Sabbath is a day of rest, and traditionally there is no cooking done on the Sabbath, the Saturday kosher dinner trays at RJDCF are served cold. (ECF No. 43-5 at 17:18–21; 18:10–13; 29:19–22.) Every week or every other week, Plaintiff received his Saturday dinner tray frozen. (*Id.* at 18:15–19:9.) For example, if Plaintiff received his dinner tray at 6:00 PM and it was frozen, he may have had to wait until around 8:00 PM for it to thaw. (*Id.* at 19:4–13; 29:19–31:6.) Plaintiff was able to bring his dinner tray to his cell to wait for it to defrost. (*Id.* at 19:10–12.) Plaintiff did not want to have to wait the two to four hours it would take for his meal to defrost before eating it. (*Id.* at 31:2–6; 32:3–5.)

Defendants argue that because Plaintiff was provided a cold, kosher dinner on Saturdays, in tradition of the Sabbath, "a two-to-three-hour delay in eating the main part of dinner" did not substantially burden his religious practices. (ECF No. 43-1 at 17.) Defendants highlight that besides the sometimes-frozen dinner tray, Plaintiff was also provided with a salad, three pieces of bread, butter, and a muffin that he could eat at dinner time without delay. (*Id.*) Defendants assert that "Plaintiff simply did not want to wait two or three hours to eat his kosher dinner tray" on some Saturdays. (*Id.*)

In his opposition, Plaintiff states that "Sabbath meal frozen cannot be eaten on Sabbath (Friday sunset to Saturday sunset) . . . if given sunset 5[:]30 PM waiting . . . is not on Sabbath anymore." (ECF No. 62 at 12.) Plaintiff therefore seems to argue that the defrosting period, depending on the time of sunset, precluded him from eating his Saturday dinner tray on the Sabbath.

The Court agrees with Defendants that Plaintiff's receipt of a frozen dinner tray on Saturdays, even if every week, did not substantially burden his observation of the Sabbath.

Plaintiff's deposition testimony makes clear that his desire to be served an unfrozen dinner tray on the Sabbath is a personal preference rather than a religious-based preference. In response to questions by defense counsel about his frozen meal, Plaintiff did not cite to any religious-based reasons for why he could not wait for his meal to defrost:

> A.    [T]hey say, "Just take it to your cell and let it defrost for a couple hours." I go, "Why do I have to do this every week or every other week." It's 6 o'clock at night and I'm going to have to wait until 8 o'clock till—my food is frozen, thaw it out. . . .
>
> Q.    But you're able to take that to your cell and let it defrost?
>
> A.    Yes. At that point, yes. What other choice do I have.

(ECF No. 43-5 at 19:3–13.) Plaintiff's frozen Saturday meals were discussed again:

> Q.    But you were able just to let that food defrost and eat it. Correct?
>
> A.    Why do I have to wait two hours, three hours, four hours to eat frozen food when everybody else is eating food at a certain time.
>
> . . . .
>
> I've got a 115, again, about this because my food was frozen[,] and I do not want to wait two or three hours to defrost my food every day. This is prison. I've got certain rights.

(*Id.* at 31:2–32:6.)

Additionally, Plaintiff's argument that he may have, at times, had to wait until after sunset to eat his dinner tray, in which case it was no longer the Sabbath, is unavailing. (*See* ECF No. 62 at 12.) Nowhere does Plaintiff allege that his Saturday dinner tray must be served to him unfrozen to comply with his religious beliefs. Nor does Plaintiff allege that to properly observe or celebrate the Sabbath, he must eat all of his dinner before sunset. The only Sabbath traditions articulated by Plaintiff are that the Sabbath is on Saturday, the Sabbath is a day of rest, and the food on Saturdays comes "refrigerated" (cold) because "Jews usually don't cook on . . . the Sabbath." (ECF No. 43-5 at 18:13; 29:19–22.) Although "protected beliefs are not limited to those that are shared by all members of a

religious community," *Callahan*, 658 F.2d at 686, Plaintiff does not allege that eating all or part of his Saturday dinner at a particular time is important to his religious practice, nor does he explain how sometimes eating his Saturday dinner tray after sunset imposes a significant burden on his observance of the Sabbath. And, as Defendants point out, Plaintiff had a salad, three pieces of bread, butter, and a muffin to eat while he waited for his meal tray to defrost. (ECF No. 43-1 at 17 (citing ECF No. 43-5 at 21:21–23).)

The Court finds that there is no genuine dispute of material fact as to whether the frozen Saturday dinner trays constituted a substantial burden on Plaintiff's practice of Judaism, and a reasonable jury could not find that Plaintiff's observation of the Sabbath was substantially burdened by having to wait two to four hours for his frozen dinner tray to defrost on some Saturdays. Accordingly, Defendants are entitled to summary judgment on this claim.

## C. Spoiled Produce

Lastly, Plaintiff alleges in his complaint that because "his [k]osher meals were [sometimes] served spoiled and not consumable," his ability to "observe Jewish kosher law" was "interfer[red] with." (ECF No. 1 at 3.) More specifically, Plaintiff's deposition testimony reveals that it was not his sealed kosher meal trays that were sometimes spoiled, but his morning produce or his dinner salad, which were provided from the RJDCF kitchen. (ECF No. 43-5 at 19:19–24; 36:14–18.)

### 1. Sincerely Held Belief, Rooted in Religion

As before, Defendants do not address, and therefore do not dispute, that Plaintiff's spoiled produce claim stems from a belief that is sincerely held and rooted in religion. Plaintiff testified in his deposition that he believes "spoiled" or "rotten food is not kosher." (*Id.* at 36:22–23; 38:25.) Plaintiff asserts this belief in his opposition as well. (ECF No. 62 at 7, 13.)

The Court finds that Plaintiff's claim that spoiled food is not kosher is one that is sincerely held and rooted in religion. There is no evidence before the Court to contradict whether Plaintiff sincerely believes that spoiled food is not kosher. *See Thomas*, 450 U.S.

at 708 ("The guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect."). Additionally, there is no dispute that the religious practice at issue here—the consumption of an adequate kosher diet—concerns a sincerely held belief that is rooted in religion. *See Malik*, 16 F.3d at 333. Thus, the Court turns to whether Plaintiff has demonstrated that receiving spoiled or rotten produce imposed a substantial burden on the exercise of his faith.

### 2. Substantial Burden

The undisputed facts show that every day, Plaintiff received a vegetable or fruit (such as an apple, banana, bell pepper, or onion) in the morning and a salad in the afternoon or evening from the RJDCF kitchen. (ECF No. 43-5 at 7:20–8:11; 20:6–21:16.) Sometimes the fruit, vegetable, or salad were served to him spoiled. (*Id.* at 9:2–10:1; 19:23–24; 20:7–21:13.) Plaintiff received spoiled produce from the RJDCF kitchen at irregular intervals: sometimes every day, sometimes once a week, or sometimes every two weeks. (*Id.* at 12:12–13; 13:14–23.) Two weeks could go by where the salad and vegetables were "fresh" and "everything [was] perfect." (*Id.* at 13:14–20.) Plaintiff refused to eat spoiled food or food with "fungus" on it. (*Id.* at 9:2–8.) Plaintiff would sometimes receive a replacement vegetable if his was spoiled. (*Id.* at 11:2–4.) Plaintiff received a replacement vegetable "about 50 percent of the time." (*Id.* at 12:9–11.) If kitchen staff did not want to "bother" replacing the spoiled vegetable, then they would tell Plaintiff to "write it up." (*Id.* at 11:2–7.)

In their motion, Defendants argue only that "[h]aving to forgo a fruit, an onion, a bell pepper, or a salad every other week—or even once a week—did not substantially burden Plaintiff's religious practices [because] he had an adequate amount of kosher food, including other fruits and vegetables that came in his kosher meal tray." (ECF No. 43-1 at 18.) Plaintiff argues that spoiled food is not kosher and that his meals are "nutritionally balanced only if all food items are good." (ECF No. 62 at 13.)

The Court agrees with Defendants that Plaintiff's receipt of spoiled produce did not substantially burden his practice of keeping kosher, but not entirely for the scant reasoning

articulated by Defendants. As an initial matter, Defendants assert in their Separate Statement of Undisputed Material Facts that "Plaintiff received a spoiled item from the kitchen, *on average*, once a week." (ECF No. 43-3 at 6 (emphasis added).) Given that Plaintiff testified to receiving a spoiled vegetable sometimes every day, sometimes once a week, or sometimes every two weeks, the Court finds that Defendants have not established, as an undisputed fact, that Plaintiff received spoiled produce only on average once a week. (ECF No. 43-5 at 12:12–13; 13:14–23.)

Nonetheless, even accepting that Plaintiff had to forgo a fruit, vegetable, or salad anywhere from once every two weeks to every day, the Court does not find that this lack of fresh produce substantially burdened his ability to maintain a kosher diet. As previously stated, under the First Amendment, inmates "have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their religion."[9] *McElyea*, 833 F.2d at 198. Here, it is undisputed that Plaintiff was a participant in the RJDCF Kosher Diet Program and received kosher food in satisfaction of his Jewish dietary laws every day. Although Plaintiff was often served food he believes did not satisfy the dietary laws of his religion, i.e. spoiled produce, Plaintiff testified that he never ate the spoiled produce. *Cf. Walls v. Schriro*, No. CV 05–2259–PHX–NVW (JCG), 2008 WL 544822, at \*5 (D. Ariz. Feb. 26, 2008) ("Requiring Plaintiff to eat food that is prohibited by his religion's dietary regimen may constitute a substantial burden on his religious practice.").

///

---

[9]    Plaintiff mentions the Eighth Amendment in passing in his opposition but does not assert an Eighth Amendment claim in his complaint. (ECF No. 62 at 8–9.) The Court notes that "[t]he Eighth Amendment requires only that prisoners receive food that is adequate to maintain [their] health." *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993). Extreme deprivations are required to make out a conditions-of-confinement claim; it is "only those deprivations denying the 'minimal civilized measure of life's necessities' [that] are sufficiently grave to form the basis of an Eight Amendment violation." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

Equally important, Plaintiff does not allege that this lack of fresh[10] produce had any adverse consequences on his health. Plaintiff states in his opposition that his meals were "nutritionally balanced only if all food items are good" but does not proffer any evidence in support of this conclusory statement. (ECF No. 62 at 13.)

The Court finds the reasoning in *Sprouse v. Ryan* persuasive. 346 F. Supp. 3d 1347 (D. Ariz. 2017). In *Sprouse*, the inmate plaintiff argued that the kosher diet he received "ha[d] insufficient calories for him to maintain his health," and thus, constituted a substantial burden on his religious beliefs. *Id.* at 1356. The defendants moved for summary judgment, and the court granted their motion on this claim. *Id.* at 1357. In its reasoning, the district court found that the plaintiff had:

> fail[ed] to present specific facts or evidence to show that receiving just 2150–2200 calories a day is inadequate, thereby forcing him to forgo or significantly alter his religious practice to maintain proper nutrition. [Plaintiff] does not allege that he lost weight or suffered other health effects as a result of eating just 2150–2200 calories a day. More importantly, he does not allege that he had to supplement his diet with non-kosher items from the commissary or non-kosher bartered foods, or that he had to take any other action that effectively forced him to violate his religious practice in order to get sufficient calories.

*Id.* at 1356.

As in *Sprouse*, Plaintiff here has not alleged that he suffered any adverse health effects directly resulting from frequently or even regularly forgoing a vegetable, fruit, or salad. Although the spoiled produce was part of the Kosher Diet Program, and not "extra,"[11] Plaintiff has not provided any evidence establishing that without the fresh

---

[10]     Plaintiff received frozen vegetables (such as carrots and peas) in his dinner meal tray and a sealed fruit cup in his breakfast tray that were never spoiled when he received them. (ECF No. 43-5 at 8:12–16; 18:1–4; 19:14–24.)

[11]     As mentioned above, Plaintiff testified that the fruits and vegetables he received in the morning and the salad he received for dinner were all "part of the kosher program." (ECF No. 43-5 at 37:16–25.)

produce, he was served a diet that was inadequate to sustain his health.  *See id.*; *Combs v. Washington*, No. C12–5280 RBL, 2014 WL 4293960, at *20 (W.D. Wash. Aug. 29, 2014) ("[Plaintiff] provides no admissible evidence to raise a material issue of fact on the nutritional adequacy of the Kosher Diet at CRCC.  [Plaintiff]'s claim . . . is based on nothing more than speculation . . . .").  Moreover, Plaintiff does not argue that consuming a diet that lacked fresh produce forced him to violate the kosher dietary laws as he believes them to be or any other sincerely held religious belief.  *See also Sefeldeen v. Alameida*, 238 F. App'x 204, 206 (9th Cir. 2007) ("Petitioner identifies no evidence in the record suggesting that eating the offered vegetarian meal plan violated any principles of his personal religious beliefs. . . .  Petitioner could point to no adverse physical effects directly resulting for the vegetarian meal plan.").  From the record before the Court, there is no genuine dispute of material fact that Plaintiff was served a kosher diet that satisfied the dietary laws of his religion and kept him in good health.  Accordingly, Defendants are entitled to summary judgment on this claim.

**D.    Additional Defenses**

On the record before the Court, there is no evidence demonstrating that the manner in which Plaintiff received his kosher meals and the contents of his kosher meals created a substantial burden on the practice of his religious beliefs.  In light of this determination, the Court need not conduct an analysis under *Turner* with respect to the claims analyzed above.  *E.g.*, *Sprouse*, 346 F. Supp. 3d at 1357.  Additionally, because the Court concludes that no constitutional violation occurred, it need not address Defendants' qualified immunity argument.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Doktoreztk v. Morales*, No. 09cv1288 JM(WVG), 2011 WL 1213074, at *4 (S.D. Cal. Mar. 30, 2011) (citing *Tibbetts v. Kulongoski*, 567 F.3d 529 (9th Cir. 2009)).

///

///

///

///

17-cv-02406-JLB-KSC

# VI.   <u>CONCLUSION</u>

Based on the foregoing, the Court finds that Defendants have met their burden of establishing the absence of a genuine issue of material fact for trial, and Plaintiff has failed to provide evidence that rebuts Defendants' showing that the manner in which Plaintiff received his kosher meals and the contents of his kosher meals created a substantial burden on the practice of his religious beliefs.  Defendants' Motion for Summary Judgment as to all of Plaintiff's claims (ECF No. 43) is therefore **GRANTED**.

This action is dismissed with prejudice.  The Clerk of Court is directed to enter judgment accordingly and close the case.

**IT IS SO ORDERED.**

Dated:  September 26, 2019

_Jill Burkhardt_
Hon. Jill L. Burkhardt
United States Magistrate Judge